

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | SEALED |
| | § | |
| v. | § | Case No. 4:22CR110 |
| | § | Judge Kernodle |
| MICHAEL LEWAYNE HILL (1) | § | |
| a/k/a Tank | § | |
| ANDREW CHARLES MORAN (2) | § | |
| TY ALAN BURKHART (4) | § | |
| JASON LAWRENCE GEIGER (5) | § | |
| a/k/a Austin St. John | § | |
| a/k/a the Red Power Ranger | § | |
| ERIC REED MARASCIO (6) | § | |
| a/k/a Phoenix Marcon | § | |
| CHRISTOPHER LEE MCELFRESH (7) | § | |
| CORD DEAN NEWMAN (8) | § | |
| ELMER OMAR AYALA (9) | § | |
| ARTHUR ATIK PONGTARATIK (12) | § | |
| MILES JUSTIN URIAS (13) | § | |
| FABIAN C. HERNANDEZ (14) | § | |
| [redacted] | § | |
| JONATHON JAMES SPENCER (19) | § | |
| a/k/a J. Spence | § | |
| [redacted] | § | |
| [redacted] | § | |
| [redacted] | § | |
| [redacted] | § | |
| [redacted] | § | |

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

## General Allegations

At all times material to the facts set forth in this First Superseding Indictment:

1. Defendants **Michael Hill** and **Andrew Moran** were individuals residing in the Eastern District of Texas.

2. On or about August 19, 2013, defendant **Michael Hill** opened a bank account at BB&T Bank ending in 6172 ("Hill's Account"), listing **Hill** as the sole authorized signer.

3. On or about June 30, 2016, defendant **Andrew Moran** opened a bank account at Woodforest National Bank ending in 0079 ("Moran's Account"), listing **Moran** as the sole authorized signer.

4. On or about January 2, 2019, **Jonathon Spencer** opened a personal bank account at JP Morgan Chase Bank ending in 1815 ("Spencer's Account"), listing **Spencer** as the sole authorized signer.

5. On or about March 15, 2018, defendant **Cord Newman** registered a business called Cord Newman Global, LLC with the state of Nevada. On or about May 8, 2018, **Newman** opened a business bank account at JP Morgan Chase Bank ending in 1302 ("Newman's Account"), under the name of Cord Newman Global, listing **Cord Newman** as the sole authorized signer.

***The Small Business Administration***

6. The United States Small Business Administration (SBA) was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

7. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

***The Paycheck Protection Program***

8. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP).

9. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

10. A PPP loan application was processed by a participating lender. If a PPP loan application were approved, the participating lender funded the PPP loan using its own

and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises.

## Overview of the Conspiracy

13. The defendants, led by **Michael Hill** and **Andrew Moran**, executed a scheme to defraud lenders and the SBA. **Hill** recruited co-conspirators to use an existing business or create a business to submit applications to obtain PPP funding. Once enlisted, **Moran** assisted his co-conspirators with the application paperwork, including fabricating supporting documentation and submitting the application through the online portals. On the applications, the defendants misrepresented material information such as the true nature of their business, the number of employees, and the amount of payroll. Based on these material misrepresentations, the SBA and other financial institutions approved and issued loans to the defendants. Once in receipt of the fraudulently obtained funds, the defendants did not use the money as intended, such as to pay employee salaries, cover fixed debt or utility payments, or continue health care benefits for employees. Instead, the defendants typically paid **Hill** and **Moran**, transferred money to their personal accounts, and spent the funds on various personal purchases. In other instances, the defendants sent the fraudulently obtained funds to **Jonathon Spencer** for purported investment in foreign exchange markets. In total, the defendants fraudulently obtained at least 16 loans and at least $3.5 million.

**Purpose of the Conspiracy**

14. It was the general purpose of the conspiracy for the defendants to unlawfully and unjustly enrich themselves by obtaining PPP loan proceeds through materially false and fraudulent pretenses, representations, and promises.

**Manner and Means of the Conspiracy**

15. The manner and means by which the defendants sought to accomplish the purpose of the conspiracy included, among others, the following:

a. The defendants registered and used sham, non-operational businesses, or in other instances existing businesses, under which they could submit PPP applications.

b. The defendants opened bank accounts under their name and their businesses to receive, deposit, and transfer PPP funds.

c. The defendants submitted materially false PPP applications, lying about, among other things, the number of employees and monthly payroll expenses.

d. The defendants submitted falsified and fabricated supporting documentation with their loan applications.

e. The defendants submitted the applications and accessed their PPP loan accounts using the internet, frequently from an internet protocol address ("IP address) that resolved back to **Andrew Moran's** residence in Lewisville, Texas, in the Eastern District of Texas.

f. The defendants and their co-conspirators used the PPP funds for unauthorized personal purposes, including but not limited to the following: cash withdrawals; gold and silver purchases; luxury jewelry items; vehicles; payments to co-conspirators **Michael Hill** and **Andrew Moran**; "investments" with **Jonathon Spencer** for use in foreign exchange markets.

g. The defendants caused transmissions that affected interstate commerce by sending wire transfers and by accessing and submitting the PPP applications online.

**Acts in Furtherance of the Conspiracy**

In furtherance of the conspiracy, the following acts, among others, were committed in the Eastern District of Texas and elsewhere.

***Cord Newman Global's Fraudulent PPP Application***

16. On or about June 20, 2020, Cord Newman Global submitted a materially false PPP loan application to Kabbage, Inc. **Cord Newman** signed the PPP application as the primary contact and designated Newman's Account as the bank account to receive the loan funds. On the application, **Newman** certified that:

> The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

The Cord Newman Global PPP loan account was accessed electronically from an IP address that resolved to defendant **Andrew Moran's** residence in Lewisville, Texas, in the Eastern District of Texas. This same IP address was also tied to the PPP loan accounts for the following co-conspirators, among others: **Miles Urias**, **Elmer Ayala**, **Fabian Hernandez**, [redacted] and **Jason Geiger**.

17. The Cord Newman Global PPP application falsely stated that the business had 9 employees and had an average monthly payroll expense of approximately $90,382. In reality, Cord Newman Global had no employees other than **Newman** and had no payroll or other identifiable business expenses. In support of the PPP application, **Newman** submitted documentation such as voided checks, IRS Schedule C forms, and invoices.

However, the documentation was false and fabricated, as the invoices contained basic errors such as references to "Cord Welborn Global" instead of the actual business name—Cord Newman Global.

18. On or about June 23, 2020, Kabbage funded the PPP loan for Cord Newman Global, and sent $225,954 to Newman's Account.

***Misuse of PPP Funds***

19. On or about June 24, 2020, approximately one day after obtaining the PPP loan, **Newman** wired more than half the PPP funds—approximately $140,000—to Hill's Account. Two days later, on or about June 26, 2020, **Newman** wired approximately $22,600 to Moran's Account. Neither **Hill** nor **Moran** were employees of Cord Newman Global.

20. Once in receipt of Cord Newman Global's PPP funds, **Hill** then transferred that money, along with other PPP funds, to Spencer's Account for investment in purported foreign exchange markets. Specifically:

a. On or about June 13, 2020, **Hill** applied for and received a $225,895 PPP loan for his own business, Alpha Operators.

b. Between on or about June 23, 2020 and on or about July 2, 2020, **Cord Newman**, **Andrew Moran**, **Jason Geiger**, and **Alexander Cortesano** transferred a total of approximately $421,000 of PPP funds to Hill's Account.

c. On or about July 3, 2020, **Hill** combined $179,000 from the Alpha Operators PPP loan along with the $421,000 from his co-conspirators, and sent approximately $600,000 of PPP funds to Spencer's Account.

21. Less than three weeks later, on or about July 24, 2020, **Spencer** wired approximately $1.4 million to an account at the Commonwealth Bank of Australia in Sydney. The $1.4 million dollars consisted of approximately $600,000 sourced by **Hill** as well as approximately $830,000 sent directly from co-conspirators recruited by **Hill**, including **Ty Burkhart**, **Eric Marascio**, **Christopher McElfresh**, **Elmer Ayala**, [redacted], [redacted], and **Andrew Moran**.

***Other Fraudulent PPP Loans***

22. The defendants and their co-conspirators fraudulently applied for and obtained several other PPP loans during the course of their scheme. The funds were not used for the designated purposes under the CARES Act, such as employee payroll, health care benefits, or utilities payments. Instead, the funds were withdrawn in cash, spent on vehicles and jewelry, or sent to co-conspirators such as **Hill**, **Moran**, or **Spencer**. For instance:

a. On or about June 16, 2020, **Ty Burkhart** obtained a PPP loan for approximately $213,925 for SmartRX. Of the PPP funds obtained, **Burkhart** paid approximately $5,000 to **Moran** and invested approximately $200,000 with **Spencer**.

b. On or about June 17, 2020, **Jason Geiger** obtained a PPP loan for approximately $225,754 for St. John Enterprises. Of the PPP funds obtained, **Geiger** sent approximately $22,579 to **Moran** and invested approximately $170,000 with **Spencer**.

c. On or about June 19, 2020, **Eric Marascio** obtained a PPP loan for approximately $225,745 for Hazelnut Café. Of the PPP funds obtained, **Marascio** sent approximately $25,000 to **Moran** and invested approximately $150,000 with **Spencer**.

d. On or about June 20, 2020, **Christopher McElfresh** obtained a PPP loan for approximately $233,231 for Ceemac Holdings. Of the PPP funds obtained, **McElfresh** sent approximately $10,000 to **Moran** and invested approximately $180,000 with **Spencer**.

e. On or about June 20, 2020, **Elmer Ayala** obtained a PPP loan for approximately $215,939 for Green Forest Sprinklers. Of the PPP funds obtained, **Ayala** sent approximately $100,000 to **Moran** and invested approximately $100,000 with **Spencer**.

f. On or about June 24, 2020, [redacted] obtained a PPP loan for approximately $227,422 for 3RDMNSN. The loan funds were deposited in an account opened by and in the name of **Arthur Pongtaratik**. Of the PPP funds obtained, **Pongtaratik** retained $10,000 for himself and paid a co-conspirator, P.K., $209,000. P.K. then purchased and provided [redacted] a $30,000 cashier's check drawn on these loan funds.

g. On or about June 26, 2020, **Miles Urias** obtained a PPP loan for approximately $222,385 for NXT Level Autos. Of the PPP funds obtained, **Urias** sent approximately $100,000 to **Moran** and used the funds at restaurants and for travel.

h. On or about June 26, 2020, **Fabian Hernandez** obtained a PPP loan for approximately $224,214 for FMP Media Group. Of the PPP funds obtained, **Hernandez** sent approximately $22,400 to **Moran** and made various luxury purchases, including at Louis Vuitton.

i. On or about June 27, 2020, [redacted] obtained a PPP loan for approximately $223,885 for Harry Chang S Corp. Of the PPP funds obtained, [redacted] sent approximately $100,000 to **Moran** and invested approximately $100,000 with **Spencer**.

j. On or about June 25, 2020, [redacted] obtained a PPP loan for approximately $227,195 for Quantum Wellness. Of the PPP funds obtained, Lewis withdrew and deposited approximately $154,000 into a personal account, which were then used for a "non-profit housing project."

k. On or about June 27, 2020, [redacted] obtained a PPP loan for approximately $220,545 for his sole proprietorship called "Frederick McKnight." Of the PPP funds obtained, [redacted] paid at least $10,000 to a

third party for a "Return on Investment" and made numerous personal purchases.

1. On or about June 29, 2020, [redacted] obtained a PPP loan for approximately $197,189 for S Corp. Of the PPP funds obtained, [redacted] transferred the entirety of the loan amount to a separate personal account.

The chart below summarizes some of the fraudulent loans obtained by the defendants:

| Date of Loan (on or about) | Business Name | Application Signer(s) and Funds Recipient(s) | Amount Funded (Approximate) |
|---|---|---|---|
| June 13, 2020 | Alpha Operators | **Michael Hill** | $225,895 |
| June 16, 2020 | SmartRX | **Ty Burkhart** | $213,925 |
| June 17, 2020 | St. John Enterprises | **Jason Geiger** | $225,754 |
| June 19, 2020 | Hazelnut Café | **Eric Marascio** | $225,745 |
| June 20, 2020 | Ceemac Holdings | **Christopher McElfresh** | $233,231 |
| June 20, 2020 | Cord Newman Global | **Cord Newman** | $225,954 |
| June 20, 2020 | Green Forest Sprinklers | **Elmer Ayala** | $215,939 |
| June 24, 2020 | 3RDMNSN | [redacted] **Arthur Pongtaratik** | $227,422 |
| June 26, 2020 | NXT Level Autos | **Miles Urias** | $222,385 |
| June 26, 2020 | FMP Media Group | **Fabian Hernandez** | $224,214 |
| June 27, 2020 | Harry Chang S Corp | [redacted] | $223,885 |
| June 25, 2020 | Quantum Wellness | [redacted] | $227,195 |
| June 27, 2020 | Frederick McKnight | [redacted] | $220,545 |
| June 29, 2020 | S Corp. | [redacted] | $197,189 |

23. In sum, the defendants and their co-conspirators obtained at least 16 loans, fraudulently drawing on at least $3.5 million of funds that were earmarked for emergency pandemic relief.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO

Violation: 18 U.S.C. § 1956(h)
(Conspiracy to Commit Money Laundering)

24. Paragraphs 1 – 23 of this First Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

25. On or about the dates set forth below, in the Eastern District of Texas and elsewhere, the defendants,

**Michael Hill**
**Andrew Moran**
**Ty Burkhart**
**Jason Geiger**
**Eric Marascio**
**Christopher McElfresh**
**Cord Newman**
**Elmer Ayala**
**Arthur Pongtaratik**
**Miles Urias**
**Fabian Hernandez**
**Jonathon Spencer**



did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1956 and Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, a violation of Title 18 United States Code Section 1343.

26. The defendants used their fraudulently obtained proceeds in ways not permitted by the PPP program. Specifically, the defendants engaged in the following transactions, among many others, in excess of $10,000:

| Defendant | Date Loan Proceeds Obtained (Approximate) | Date of Transaction (Approximate) | Description of Transaction in Excess of $10,000 With Fraudulently Obtained Loan Funds |
|---|---|---|---|
| **Michael Hill** | June 13, 2020 | July 1, 2020 | $50,000 transfer to personal account |
| **Ty Burkhart** | June 16, 2020 | June 29, 2020 | $200,010 cash withdrawal |
| **Jason Geiger** | June 17, 2020 | June 23, 2020 | $100,000 wire transfer to **Hill** |
| **Eric Marascio** | June 19, 2020 | June 30, 2020 | $25,000 purchase of cashier's check |
| **Christopher McElfresh** | June 20, 2020 | July 3, 2020 | $180,000 wire transfer to **Spencer** |
| **Cord Newman** | June 20, 2020 | June 26, 2020 | $22,600 wire transfer to **Moran** |
| **Elmer Ayala** | June 20, 2020 | June 24, 2020 | $100,000 wire transfer to **Moran** |
| **Arthur Pongtaratik** | June 24, 2020 | July 7, 2020 | $209,650 wire transfer to co-conspirator P.K. |
| [REDACTED] | June 24, 2020 | July 10, 2020 | Receipt, deposit, and partial cash withdrawal of $30,000 cashier's check purchased with loan funds |
| **Miles Urias** | June 26, 2020 | July 6, 2020 | $100,000 wire transfer to **Moran** |
| **Fabian Hernandez** | June 26, 2020 | July 8, 2020 | $22,400 wire transfer to **Moran** |
| [REDACTED] | June 27, 2020 | July 3, 2020 | $100,000 wire transfer to **Moran** |
| [REDACTED] | June 25, 2020 | July 21, 2020 | $154,00 transfer to account for "non-profit housing project" |
| [REDACTED] | June 27, 2020 | July 2, 2020 | $10,037 wire transfer to M.W. for "Return on Investment" |
| [REDACTED] | June 29, 2020 | July 14, 2020 | $268,796 (including full amount of loan funds) wire transfer to separate personal account |
| **Jonathon Spencer** | June and July 2020 | July 24, 2020 | $1.4 million wire transfer to Commonwealth Bank of Australia |

All in violation of 18 U.S.C. § 1956(h).

**NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE**

1. The allegations contained in Counts 1 and 2 of this First Superseding Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1349, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property, which is subject to forfeiture, includes but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

3. Upon conviction of any violation of 18 U.S.C. § 1956, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1), including a money judgment representing funds involved in the offense.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendants:

a. Cannot be located upon the exercise of due diligence;

b. Has been transferred, or sold to, or deposited with a third party;

c. Has been placed beyond the jurisdiction of the Court;

d. Has been substantially diminished in value; or

e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

5. By virtue of the commission of the offenses alleged in this First Superseding Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

______________________________
GRAND JURY FOREPERSON

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

______________________________
ANAND VARADARAJAN
G.R. JACKSON
Assistant United States Attorneys

______________________________
Date